Bonnie Richardson, OSB No. 983331
Email: bonnie@richardsonwang.com
Richardson Wang LLP
100 SW Main, Suite 400
Portland, OR 97204
Telephone: (503) 546-4637
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| Shannon Conley, Conservator for Z.C., a minor | ) | Case No. |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | |
| vs. | ) | [_____] |
| | ) | |
| Kim Chapman, Anastasia Tibbetts, Kassidy O'Brien, Erin Lane, Oregon Department of Human Services | ) | JURY TRIAL REQUESTED |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff alleges as follows:

**PARTIES**

1.

Plaintiff Z.C. is a minor (born in December 2010) who at all times relevant was a resident of Lane County Oregon. He appears through Shannon Conley, a conservator appointed for him in Lane County Circuit Court.

2.

Defendant Kim Chapman was an Oregon Department of Human Services ("DHS") employee acting in the scope of her employment. Chapman certified Nicole Marie Duncan ("Duncan") and Joe Albert Raygosa ("Raygosa") to operate a foster home and placed Z.C. and

Page 1 -COMPLAINT

his older sister, J.C., into that home.

3.

Defendant Anastasia Tibbetts was a DHS employee acting withing the scope of her employment who supervised Chapman. Tibbetts approved Duncan and Raygosa's operation of a foster home by signing a Certificate of Authorization before completion of a SAFE Study.

4.

Defendant Kassidy O'Brien was a DHS employee acting within the scope of her employment as a case worker for Z.C. and J.C. from July 2016-May 2018, and had a duty to protect the children from the abuse they suffered in the Duncan Raygosa home.

5.

Defendant Erin Lane was a DHS employee acting within the scope of her employment who supervised O'Brien and failed to remove Z.C. from the home or require O'Brien to do so even as other foster children were being removed from that home for safety concerns.

6.

Defendant DHS was responsible for the delivery and administration of federal and state programs relating to the provision of foster care services. DHS had physical and legal custody of Z.C. and had a duty to protect his legal interests.

7.

DHS is liable under *respondeat superior* and through the Oregon Tort Claims Act for the acts and omissions of the above-named individual Defendants, foster parent Duncan, and foster parent Raygosa.

8.

During their respective agency and employment relationships with DHS, all Defendants and foster parents acted for and on behalf of one another and are jointly and severally liable.

9.

Defendant Does 1-5 are attorneys, caseworkers, supervisors, certifiers, child protective

Page 2 -COMPLAINT

service workers, directors, officers, managers, resource parents, and others who engaged in constitutional deprivations, statutory violations, and/or torts and/or aided and abetted in the alleged constitutional deprivations, statutory violations, and/or torts. Their identities and the nature of their involvement remain unknown to Plaintiff but will become known as discovery progresses.

**JURISDICTION**

10.

The Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff alleges violations of his civil rights under 42 U.S.C. §§ 1983 and 1988. Plaintiff seeks this court's exercise of supplemental jurisdiction under 28 U.S.C. §1367(a) over his related state law claims.

**GENERAL ALLEGATIONS**

11.

Z.C. was born in December 2010. His family of origin consisted of his mother, father, and older sister, J.C., the minor plaintiff in a related case (Case No. 6:22-cv-01813-MK).

12.

In July of 2016, DHS removed Z.C. and J.C. from their family of origin and placed them in the care of Duncan and Raygosa, newly certified foster care providers in Lane County. Foster children are exceptionally vulnerable to abuse and dependent on Oregon and its DHS workers to assure their safety and well-being. Z.C. had a special relationship with Oregon, and his placement in this home ultimately amounted to a state-created danger.

13.

Duncan and Raygosa moved to Oregon from California in 2015. They applied to become certified foster parents through a Native American Tribe but were denied certification for reasons not yet known.

/ / /

Page 3 -COMPLAINT

14.

Sometime after that denial and before June of 2016, Duncan and Raygosa applied to DHS in Lane County to become certified foster care providers.

15.

After their application, but before becoming certified, prospective foster parents are routinely subject to a Structured Analysis Family Evaluation Home Study ("SAFE Study") or home study. DHS certifiers like Chapman use the SAFE Study to elicit information from foster care applicants and to ensure the health, safety, and well-being of children in their foster homes. SAFE Studies include interviews, home visits, safety inspections, background checks, and meeting any other children or adults who live in the home, as well as gathering medical and psychological histories of the prospective foster parents. The SAFE Study is designed to evaluate and provide background information on the safety and fitness of prospective foster parents.

16.

DHS knew that a failure to routinely and correctly utilize SAFE Studies risked children's welfare by placing extremely vulnerable children in the care of potentially unfit adults, or adults whose homes would not be appropriate. Nevertheless, DHS, through Chapman, issued a Certificate of Approval ("COA") allowing Duncan and Raygosa to operate as foster care providers before completing their SAFE Study.

17.

A SAFE Study could have revealed many red flags about the couple, such as: a three year-old died in their custody in California in 2012 under circumstances that the emergency medical responders reported as potential child abuse; the reason the Native American Tribe denied them foster parent certification; that both Duncan and Raygosa had histories of extreme childhood trauma, abuse, abandonment, and neglect; that they had no family or community support in Oregon, and that their claimed reason for moving to Oregon was false (they said it was to care for Raygosa's mother but she died in 2010). The home was small, and housed, in addition to Duncan

Page 4 -COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

and Raygosa, Raygosa's adult child and two non-foster children who Duncan and Raygosa claimed were their niece and nephew.

18.

DHS knew that Duncan and Raygosa preferred female foster children, but placed the 5-year-old Z.C. in their care, along with his older sister (J.C., age 9). Raygosa became immediately infatuated with J.C., insisting that she call him "dad" and discussing her adoption. Meanwhile, Raygosa and Duncan rejected Z.C. and requested his removal as early as August 2016, accusing him of "lying" and other behaviors that indicated Z.C. was experiencing emotional distress. DHS took no action to investigate the cause of Z.C.'s distress or to evaluate whether Duncan and Raygosa were appropriate foster parents for this child.

19.

In October 2016, a medical provider called the DHS hotline to report medical neglect of the other two minors in the Duncan Raygosa home (the alleged niece and nephew). DHS failed to investigate the report.

20.

In November 2016, Z.C. began exhibiting signs of severe emotional distress including bedwetting and suicidal ideation. Again, DHS failed to investigate the conditions of the home or the reasons for these symptoms.

21.

DHS approved Duncan and Raygosa's home for three more foster children in December 2016, resulting in ten people (five of them children in DHS's custody) living in the small home.

22.

Before the end of December 2016, DHS had received multiple reports about children in Duncan and Raygosa's care. A developmentally disabled child's hair was singed. Children developed rashes and were noted as having poor hygiene. Children were left unsupervised.

/ / /

Page 5 -COMPLAINT

23.

After these reports, DHS removed some of the children from the home to protect their safety, but left Z.C. and J.C. in the home.

24.

Duncan and Raygosa began requesting that Z.C. be removed from the home as early as August 2016 (he arrived in July of the same year). They said that he was constantly lying, getting sick, and getting everyone else in the home sick. They blamed Z.C. when one of their non-foster children got a flu that ended in her hospitalization. They claimed he was "aggressive" but also claimed he "tends to do these things when nobody is watching."

25.

In March 2017, DHS placed two more children in Duncan and Raygosa's care. These children had a different caseworker who observed that Duncan and Raygosa didn't learn the children's names or tell the new children what to call them.

26.

When these new children arrived for their first parental visitation, their caseworker observed that one of them had a black eye and facial scratches and the other had head trauma and facial scratches. One of the children said he was beaten with a hanger. Their caseworker described the children as "pretty banged up" and confronted Duncan and Raygosa about these claims. Duncan and Raygosa said the children had arrived that way, a statement which DHS knew or should have known was false.

27.

The injured children were removed from the Duncan Raygosa home to protect their safety, but again DHS did not remove Z.C. and J.C., despite Z.C.'s reporting that Duncan had pulled him by his hair when he refused to clean his room, and that he had been put in the garage with the lights off and made to stay there until he calmed down.

/ / /

Page 6 - COMPLAINT

28.

On June 25, 2017, the now-six-year-old Z.C., escaped from the home by climbing over a tall fence after being left in the backyard alone. He was found 1.2 miles away from the home, alone, wearing only shorts and flip flops, wandering in a lane of traffic on Highway 99, in 90+ degree heat. Police received three calls about a small child walking in the road. When asked, Z.C. said he was going to get food from his friends' house because he was hungry.

29.

Duncan and Raygosa failed to report Z.C. missing from the home for more than 30 minutes after they discovered he was not in the backyard.

30.

When the police returned Z.C. to the home, Duncan and Raygosa seemed unconcerned with his condition. They told the police Z.C. had a history of lying. When questioned, Duncan and Raygosa claimed that they couldn't imagine how Z.C. escaped because the yard was fenced. Police asked Z.C. how he'd gotten out, and he showed them how he climbed over the fence because he was looking for food and didn't like being left alone.

31.

Upon re-entering the home, police observed Duncan on the telephone with Chapman, "begging" DHS to re-home Z.C. while in front of the child. Police observed that Z.C. was very upset by this conversation.

32.

The next day, June 26, 2017, Duncan again asked Chapman to remove Z.C. from the home for his lying. Upon learning that DHS would also move J.C., Duncan and Raygosa backpedaled and asked to keep both children. DHS acquiesced and left the children in the home.

33.

On June 27, 2017, caseworker O'Brien interviewed both J.C. and Z.C. about what happened. J.C. was very upset with Z.C. and blamed him for everything bad happening in the

Page 7 -COMPLAINT

RICHARDSON WANG LLP
100 SW Main, Suite 400
Portland, OR 97204
Telephone: (503) 546-4637

home. Z.C. said that Duncan had read him his updated supervision plan (sent by his caseworker to Duncan and Raygosa after they so poorly supervised Z.C.) and told him he had to wear a leash in public so he didn't run away.

34.

Duncan told O'Brien that the family had a meeting with the three adults and J.C. about how to better supervise Z.C. She claimed that J.C. was included because it was partially going to be her job to keep Z.C. safe.

35.

DHS failed to disclose any of the concerns other caseworkers raised about Duncan and Raygosa to the court. DHS did not tell the court that multiple foster children had been removed from the Duncan Raygosa home for safety reasons.

36.

Z.C. spent a year in an unfit foster home where he was scapegoated, blamed, neglected, and emotionally abused. Duncan and Raygosa manipulated Z.C.'s older sibling, J.C. into turning on the younger brother she had always cared for. The loss of his only emotional support in the home was devastating to Z.C., who continued to be blamed, scapegoated, and abused by both foster parents.

37.

On July 6, 2017, DHS removed Z.C. and J.C. from the Duncan-Raygosa home due to their failure to adequately and safely supervise Z.C., which allowed him to flee the home. The siblings were placed in separate homes. However, DHS continued to have the children visit with Duncan and Raygosa through October 2017. During these visits, DHS workers observed Raygosa's fixation on J.C. and both Duncan and Raygosa's inattention to Z.C. DHS continued to arrange these visits even after these observations.

38.

These visits only ceased when J.C. disclosed that Raygosa had been sexually abusing her.

Page 8 -COMPLAINT

Duncan and Raygosa fled the state. Raygosa was extradited from Oklahoma, stood trial in February 2018, and was convicted of multiple counts of first-degree Sexual Abuse, Unlawful Sexual Penetration, Sodomy, and Rape.

39.

At a hearing on May 15, 2018, the dependency judge for both Z.C. and J.C. ordered DHS to prepare a sealed document detailing exactly when DHS became aware of abuse occurring to the children while in DHS custody. This Affidavit noted that in addition to J.C.'s reports of sexual abuse by Raygosa, DHS had received six calls of concern regarding child safety in the year Z.C. and J.C. lived with Duncan and Raygosa. While other children were removed for safety concerns, DHS did not remove Z.C. and J.C., leaving them to suffer unnecessarily for an entire year while not informing the court of the concerns about their placement. The Affidavit also mentions that Z.C. reported sexual contact by a foster child at a later placement in 2018. Not much is known about this incident, but plaintiff expects that more will become known as discovery progresses.

## FIRST CLAIM FOR RELIEF

### Deprivation of Civil Rights 42 U.S.C. § 1983 AGAINST Defendant Chapman and Does

_____

40.

All preceding paragraphs are incorporated and realleged.

41.

42 USC §1983 imposes liability on any person who, under color of law, commits civil rights violations. At all times relevant, Defendant Chapman was acting under color of law.

42.

Under §1983, Z.C. has an established right to safe foster care including adequate social worker supervision, and protection from infliction of harm by a foster care provider.

43.

As the foster home certifier, Chapman had a duty to investigate Duncan and Raygosa's

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

backgrounds and obtain and evaluate information regarding their fitness to serve as foster care providers. These standards, listed in Chapter 413 of the Oregan Adopted Rules ("OARs"), require that foster care providers possess and demonstrate specific abilities and characteristics that bear on child safety. Chapman failed to ensure that Duncan and Raygosa met these standards before placing Z.C. in their home.

44.

Chapman acted with deliberate indifference to Z.C.'s liberty interest by:

a.  Failing to complete a SAFE study on the Duncan Raygosa home prior to certifying the home or placing children there;

b.  Certifying the Duncan Raygosa home even though it did not meet the standards listed in the OARs;

c.  Failing to remove Z.C from the home when other children were being removed for safety concerns;

d.  Failing to investigate Duncan's allegations that Z.C. was lying;

e.  Failing to investigate and/or remove Z.C. from the home when Duncan and Raygosa repeatedly asked for his "rehoming."

f.  Failing to investigate the cause of Z.C.'s severe emotional distress manifest in his suicidal ideation, bedwetting, and "lying."

g.  Failing to investigate Z.C.'s claims of physical and/or emotional abuse (like being left alone in the dark as punishment, having his hair pulled, told that he had to wear a leash in public).

45.

Chapman's conduct proximately caused Z.C.'s injuries, some or all of which are permanent.

46.

Z.C. suffered injuries including fear, confusion, severe emotional distress, psychological

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support due to Duncan and Raygosa's abuse and emotional manipulation of J.C. and neglect of Z.C.

47.

Plaintiff is entitled to the reasonable and necessary litigation costs and attorney fees incurred pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Deprivation of Civil Rights 42 U.S.C. § 1983 AGAINST Defendant Tibbetts and Does

_____

48.

All preceding paragraphs are incorporated and realleged.

49.

42 USC §1983 imposes liability on any person who, under color of law, commits civil rights violations. At all times relevant, Defendant Tibbetts was acting under color of law.

50.

Tibbetts acted with deliberate indifference to Z.C.'s liberty interest in the following ways:

a.  Failing to adequately train or supervise Chapman;

b.  Failing to investigate, or require Chapman to investigate, Duncan and Raygosa's background before certifying them;

c.  Certifying Duncan and Raygosa to operate a foster home despite their suspicious backgrounds;

d.  Approving or acquiescing in Z.C.'s placement in the home despite Duncan and Raygosa's stated preference for little girls;

e.  Failing to ensure Z.C. was safe in the home;

f.  Failing to investigate or ignoring reports of abuse and neglect occurring in the home;

Page 11 - COMPLAINT

g.  Overfilling the home;

h.  Acquiescing or approving of Z.C.'s continued placement in the home even after he displayed signs of severe emotional distress including suicidal ideation;

i.  Acquiescing or approving of Z.C.'s continued placement in the home after he was found wandering on the side of the highway, alone; and keeping him there even after Duncan and Raygosa scapegoated him and tried to have him removed;

j.  Acquiescing or approving of the continued visits even after the favoritism toward J.C. and neglect of Z.C. was observed;

51.

Tibbetts' conduct was the proximate cause of Z.C.'s injuries some or all of which is permanent.

52.

Z.C. suffered damages and injuries including fear, confusion, severe emotional distress, psychological injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support due to Duncan and Raygosa's emotional manipulation of J.C. and neglect of Z.C.

53.

Plaintiff is entitled to the reasonable and necessary litigation costs and attorney fees incurred pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**Deprivation of Civil Rights 42 U.S.C. § 1983 AGAINST Defendant O'Brien and Does**

_____

54.

All preceding paragraphs are incorporated and realleged.

/ / /

Page 12 - COMPLAINT

55.

42 USC §1983 imposes liability on any person who, under color of law, commits civil rights violations. At all times relevant, Defendant O'Brien was acting under color of law.

56.

As his caseworker, O'Brien was required to have meaningful face-to-face contact with Z.C. in the home. She was also required to update her recommendations on Z.C.'s placement based on Z.C.'s emotional, mental, and physical health.

57.

O'Brien acted with deliberate indifference to Z.C.'s liberty interest in one or more of the following ways:

a.  Failing to protect Z.C.;

b.  Failing to investigate and/or ignoring signs that Z.C. was being emotionally abused and scapegoated by Duncan and Raygosa;

c.  Failing to remove Z.C. from the home upon learning that other children were being removed due to Duncan and Raygosa's mistreatment and neglect;

d.  Failing to recognize the signs that J.C. was being groomed and sexually abused by Raygosa, while Z.C. was being scapegoated and neglected, and that this dynamic was actively harming the siblings' relationship;

e.  Failing to remove Z.C. from the home immediately after he was found wandering on the side of a highway, alone, at six years old or any of the repeated times that Duncan and Raygosa asked for Z.C.'s removal;

f.  Acquiescing in continued visitation and contact with Duncan and Raygosa even after Z.C. was removed from the home, even after Duncan and Raygosa's neglect of Z.C. and preference for J.C. was observed by caseworkers during those visits;

58.

O'Brien's conduct was the proximate cause of Z.C.'s damage, some or all of which is

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

permanent.

59.

Z.C. suffered damages and injuries including fear, confusion, severe emotional distress, psychological injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support due to Duncan and Raygosa's emotional manipulation of J.C. and neglect of Z.C.

60.

Plaintiff is entitled to the reasonable and necessary litigation costs and attorney fees incurred pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### Deprivation of Civil Rights 42 U.S.C. § 1983 AGAINST Defendant Lane and Does

_____

61.

All preceding paragraphs are incorporated and realleged.

62.

42 USC §1983 imposes liability on any person who, under color of law, commits civil rights violations. At all times relevant, Defendant Lane was acting under color of law.

63.

Defendant Lane acted with deliberate indifference to Z.C.'s liberty interest and rights in one or more of the following ways:

a.  Failing to properly train caseworker O'Brien;

b.  Failing to properly supervise caseworker O'Brien;

c.  Failing to protect Z.C.'s physical, emotional, and mental safety while in the care of DHS;

d.  Acquiescing in or approving the failure to investigate the source or cause of Z.C.'s

Page 14 -COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

severe emotional distress including suicidal ideation;

e.  Acquiescing in or approving O'Brien's failure to remove Z.C. from the Duncan
    Raygosa home even in the face of the evidence of abuse, maltreatment, and neglect of
    both Z.C. and other children placed there;

f.  Permitting Duncan and Raygosa to keep fostering Z.C. even after he was found
    wandering alone on the side of a highway;

64.

Lane's conduct was a proximate cause of injury and damage to Z.C., some or all of
which is permanent.

65.

Z.C. suffered damages and injuries including fear, confusion, severe emotional distress,
psychological injuries, physical injuries, disruption of attachment, cognitive and developmental
delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling
relationship and only familial support due to Duncan and Raygosa's emotional manipulation of
J.C. and neglect of Z.C.

66.

Plaintiff is entitled to the reasonable and necessary litigation costs and attorney fees
incurred pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM FOR RELIEF**

**Negligence-- AGAINST Defendants DHS, Chapman, Tibbetts, O'Brien, Lane, and Does**

_____

67.

All preceding paragraphs are incorporated and realleged.

68.

DHS is liable for its negligent conduct and vicariously liable for the tortious conduct of
its officers, employees, and agents acting withing the scope of their employment or duties.

Page 15 -COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

69.

Each and every act of physical abuse, neglect, and exposure to sexual abuse and neglect perpetrated against Z.C. was a separate occurrence and cause of Z.C.'s injuries.

70.

DHS's duty to protect Z.C.'s safety was non-delegable.

71.

DHS acted negligently in one of more of the following ways:

a. Failing to properly train Chapman;

b. Failing to properly supervise Chapman;

c. Failing to properly train Tibbetts;

d. Failing to properly supervise Tibbetts;

e. Failing to properly train O'Brien;

f. Failing to properly supervise O'Brien;

g. Failing to properly train Lane;

h. Failing to properly supervise Lane;

i. Certifying Duncan and Raygosa when it knew or should have known they were unfit to be foster parents;

j. Placing Z.C. in the Duncan Raygosa home when it could not meet his needs;

k. Failing to adequately protect Z.C.'s safety;

l. Failing to timely remove Z.C. from the home;

m. Acquiescing in continued visits with Duncan and Raygosa after removal despite observance of their emotional neglect of Z.C. during these visits.

72.

DHS's negligence was a substantial factor in the cause of Z.C.'s injuries and damages some or all of which may be permanent.

/ / /

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

73.

Z.C. suffered damages and injuries including fear, confusion, severe emotional distress, psychological injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support due to Duncan and Raygosa's emotional manipulation of J.C. and neglect of Z.C.

## SIXTH CLAIM FOR RELIEF

### Negligence *per se*

### AGAINST Defendants DHS, Chapman, Tibbetts, O'Brien, Lane, and Does

_____

74.

All preceding paragraphs are incorporated and realleged.

75.

DHS was negligent per se in one or more of the following ways:

a.      Failing to place Z.C. in the least physically restrictive environment that appropriately met his needs in violation of OAR 413-010-0180(1)(a);

b.      Failing to provide appropriate care, supervision, and discipline in violation of OAR 413-010-0180(1)(c);

c.      Failing to provide routine and necessary medical, dental, and mental health care treatment in violation of OAR 413-010-0180(1)(d);

d.      Failing to protect Z.C. from physical abuse, emotional abuse, neglect and exploitation in violation of OAR 413-010-0180(1)(f);

e.      Failing to provide a safe, permanent alternative to the family when the family resources were not available in violation of OAR 413-010-0180(1)(h);

f.      Failing to monitor the Duncan and Raygosa home and have face to face contact with Z.C. monthly in violation of OAR 413-080-0059;

Page 17 -COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

g.    Failing to place Z.C. with a person or family in good standing for care or services in violation of ORS 418.015(3).

76.

DHS's negligence per se was a substantial factor in the cause of Z.C.'s injuries some or all of which may be permanent.

77.

Z.C. suffered damages and injuries including fear, confusion, severe emotional distress, psychological injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self-esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support due to Duncan and Raygosa's emotional manipulation of J.C. and neglect of Z.C.

**SEVENTH CLAIM FOR RELIEF**

**Liability Under ORS.30.297 for Torts of Foster Children-- AGAINST Defendant DHS**

_____

78.

All preceding paragraphs are incorporated and realleged.

79.

DHS is responsible for intentional torts committed by foster children residing in certified foster homes.

80.

Z.C. was touched in a sexual manner by another foster child in approximately January of 2018 while both were residing in a DHS certified foster home.

81.

Z.C. was threatened by a foster child in the Duncan-Raygosa home who claimed that he had a knife and would harm him and the other children.

/ / /

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

82.

Z.C. was punched by another foster child in the Duncan-Raygosa home.

83.

This tortious conduct caused Z.C. to suffer non-economic damages and injuries including fear, confusion, emotional distress, psychological injuries, loss of self-esteem, lack of trust, and suspicion of caregivers.

## EIGHTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

### AGAINST Defendants DHS, Chapman, Tibbetts, O'Brien, Lane, and Does

_____

84.

All preceding paragraphs are incorporated and realleged.

85.

DHS, Chapman, Tibbetts, O'Brien, Lane, and Does all had a special relationship to Z.C. as he was a vulnerable foster child who had been removed from his family and placed in the care and custody of the state. This relationship included a duty to care for Z.C. that goes beyond the general duty to avoid negligence.

86.

Z.C. suffered emotional distress by:

a.   being kept in a foster placement where his sister, J.C., was being repeatedly sexually abused by foster parent Raygosa and turned against him by the foster parents;

b.   being kept in a foster placement where he was scapegoated and accused of lying;

c.   being kept in a foster placement where he was emotionally and/or physically abused;

d.   being kept in a foster placement where he was told he was not wanted.

87.

DHS, Chapman, Tibbetts, O'Brien, Lane, and Does are liable for Z.C.'s emotional

Page 19 - COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

distress as a result of this placement.

## NINTH CLAIM FOR RELIEF

## Violation of ORS 124.105

## AGAINST Defendant DHS

_____

88.

All preceding paragraphs are incorporated and realleged.

89.

Z.C. was, at all times relevant, a vulnerable person within the meaning of ORS

124.100(1)(e) and entitled to the protection of ORS 124.100 *et seq.* because he was an

incapacitated person as defined by ORS 125.005.

90.

Z.C., a 5-6 year old child at the relevant time, lacked the ability to meet his own needs for

physical health and safety, food, shelter, clothing, and personal hygiene. He could not manage

money or purchase necessities.

91.

Z.C. could not effectively communicate his experiences of abuse due to his infancy.

92.

Duncan and Raygosa's actions alleged in the preceding paragraphs constituted physical

abuse within the meaning of ORS 124.105.

93.

DHS, through its employees or agents acting within the course and scope of their duties,

permitted Duncan and Raygosa to engage in physical abuse and failed to act under circumstances

in which a reasonable person should have known there was physical abuse.

94.

As a result of the alleged acts and omissions, Z.C. suffered damages and injuries

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

including fear, confusion, severe emotional distress, psychological injuries, physical injuries, disruption of attachment, cognitive and developmental delays, loss of self esteem, lack of trust, suspicion of caregivers, and loss of his sibling relationship and only familial support.

95.

Plaintiff is entitled to amounts equal to three times his economic and non-economic damages pursuant to ORS 124.100(2)(a) and (b).

96.

Plaintiff is also entitled to recover reasonable attorney fees pursuant to ORS 124.100(2)(c) and reasonable fees for the services of his conservator pursuant to ORS 124.100(2)(d).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in their favor and against defendants as follows:

A. On the first claim for relief against Chapman and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts not to exceed $5,000,000 dollars and economic damages in the amount to be proven at trial, plus reasonable attorney fees, costs, and disbursements, and such other relief as the court may deem equitable and just.

B. On the second claim for relief against Tibbetts and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts not to exceed $5,000,000 dollars and economic damages in the amount to be proven at trial, plus reasonable attorney fees, costs, and disbursements, and such other relief as the court may deem equitable and just.

C. On the third claim for relief against O'Brien and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts not to exceed $5,000,000 dollars and economic damages in the amount to be proven at trial,

Page 21 -COMPLAINT

**RICHARDSON WANG LLP**
100 SW Main, Suite 400
Portland, OR 97204
Telephone:  (503) 546-4637

plus reasonable attorney fees, costs, and disbursements, and such other relief as the court may deem equitable and just.

D. On the fourth claim for relief against Lane and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts not to exceed $5,000,000 dollars and economic damages in the amount to be proven at trial, plus reasonable attorney fees, costs, and disbursements, and such other relief as the court may deem equitable and just.

E. On the fifth claim for relief against DHS, Chapman, Tibbetts, O'Brien, Lane, and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts, not exceeding $5,000,000 and economic damages in the amount to be proven at trial, plus costs, and disbursements.

F. On the sixth claim for relief against DHS, Chapman, Tibbetts, O'Brien, Lane, and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts, not exceeding $5,000,000 and economic damages in the amount to be proven at trial, plus costs, and disbursements.

G. On the seventh claim for relief against DHS, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts, not exceeding $5,000,000 and economic damages in the amount to be proven at trial, plus costs, and disbursements.

H. On the eighth claim for relief against DHS, Chapman, Tibbetts, O'Brien, Lane, and Does, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts, not exceeding $5,000,000 and economic damages in the amount to be proven at trial, plus costs, and disbursements.

I. On the ninth claim for relief against DHS, Plaintiff seeks non-economic damages in an amount the jury determines in accordance with the law and facts, not exceeding $5,000,000, trebled pursuant to ORS 124.100(2)(b) and economic damages in the

Page 22 -COMPLAINT

amount to be proven at trial, trebled pursuant to ORS 124.100(2)(a), reasonable

attorney fees incurred pursuant to ORS 124.100(2)(c); reasonable conservator fees

incurred by the litigation of this claim, costs and disbursements incurred.

J. Plaintiff seeks all further relief as the Court may deem equitable and just.

DATED this 18th day of September, 2023.

RICHARDSON WANG LLP

By _____

Bonnie Richardson, OSB No.
983331
bonnie@richardsonwang.com
Marissa Korbel, OSB No. 230272
marissa@richardsonwang.com
Attorneys for Plaintiff

Trial Attorney:  Bonnie Richardson

Page 23 - COMPLAINT